Plaintiffs brought these consolidated actions for the wrongful deaths of their decedents in the crash of an airplane manufactured by defendant Piper Aircraft Corporation (Piper). The primary contention on appeal regards an evidentiary ruling by the trial court which allowed into evidence several reports on exhaust system failures in aircraft. The trial court overruled Piper's objection to admission of the reports on the grounds, inter alia, that they were hearsay, basing its ruling on its opinion that they were admissible at least to show what knowledge could be imputed to Piper.
On September 7, 1977, David Evans, Kenneth Hendrix, and Francis Bodnar died in the crash of a Piper PA 28-151 airplane, commonly called a Cherokee Warrior. This airplane was registered by the Federal Aviation Administration (FAA) as N-43485. The crash occurred at approximately 11:05 p.m. local time near Danville, Georgia, as the airplane was approaching Macon, Georgia, for a stop en route from Savannah, Georgia, to Birmingham, Alabama.
Toxicology tests showed carbon monoxide in the blood of the deceased men in concentrations high enough to cause death or at least unconsciousness prior to the crash. The aircraft's muffler had cracks in it which, according to expert witnesses, existed prior to the crash. Such cracks could have introduced carbon monoxide into the cabin air by way of the airplane's heater or defroster.
The widow of each occupant brought suit as administratrix of her husband's estate against Piper and others. Mrs. Bodnar's suit was not consolidated with the two cases at bar; this Court decided an appeal of her case in Bodnar v. Piper AircraftCorporation, 392 So.2d 1161 (Ala. 1980). One of the holdings of that opinion was that the Georgia Wrongful Death Statute would apply to Mrs. Bodnar's claim.
The suits brought by Mrs. Hendrix and Mrs. Evans were consolidated for trial and tried before a jury from June 3, 1981, through June 16, 1981. The jury returned a verdict of $350,000.00 for Mrs. Evans and $450,000.00 for Mrs. Hendrix. These verdicts were entered solely against Piper, as the other named defendants had settled with plaintiffs prior to trial. Piper appeals from the judgments entered on these verdicts and from the denial of its motions for judgment notwithstanding the verdict and in the alternative for new trial.
Under Georgia Code Annotated, §§ 105-1301 and -1302, this case was tried on the issue of negligence. Cf. CaterpillarTractor Co. v. Ford, 406 So.2d 854 (Ala. 1981). Plaintiffs complained that Piper "negligently designed, engineered, manufactured and/or sold said aircraft," and that this negligence proximately caused the crash and deaths.
The claim of negligence focused on Piper's use of a particular metal, 321 stainless steel, for the muffler in the Cherokee Warrior. To heat the cabin or defrost the windshield of the airplane, the pilot opens a vent which allows air from outside the plane to pass through an aluminum shroud surrounding the muffler, become heated, and continue into the cabin. Thus, if the muffler develops any leaks, exhaust fumes, *Page 588 
including carbon monoxide, mingle with the air in the shroud and enter the cabin when the heater or defroster is turned on.
The evidence showed that the muffler in this airplane had undergone processes of carburization — combination of carbon molecules with the metal — and oxidation. These processes weakened the muffler, made it brittle, and allowed it to crack. Metallurgical experts demonstrated that at least one crack existed prior to the crash by pointing out that the metal surrounding the crack was carburized all the way through although the sealed portions of the muffler were carburized only on the inside. The plaintiffs contend that Piper negligently selected a metal which would carburize, crack, and permit carbon monoxide to enter the cabin.
Piper responded that 321 stainless steel is the standard metal for mufflers in general aviation aircraft, that the FAA approved the Warrior for airworthiness, and that this particular airplane was negligently maintained. Piper argued at trial that the poor maintenance on this airplane was an intervening cause, both because the engine subjected the muffler to abnormal stress by running too hot or backfiring and because proper inspection would have disclosed damage to the muffler. These factual arguments, however, are for the jury.
The main controversy centers around five reports published by the FAA from 1964 through 1970 about exhaust system failures in general aviation aircraft. The trial court allowed the plaintiffs to introduce these reports as plaintiffs' exhibits 80 through 84, over Piper's objection. Piper argued strenuously that the reports were hearsay and that three of them, exhibits 82 through 84, were not provided to Piper before trial as the pre-trial order required. The trial court ruled during an in-chambers discussion as follows:
 I think they are admissible to show what knowledge could be imputed — could possibly be imputed to Piper of what the state of the art was and whatever problems were being encountered with the use of this material if for no other purpose."
Piper responds that it had never received these reports. Ward Evans, the FAA representative at the Piper plant where Cherokee Warriors were manufactured, testified that he was "fairly certain the FAA never forwarded these to us as a manufacturer," and that he had never seen them before.
These reports, however, stem from a conference held by the FAA on September 9-10, 1964, on "Engineering and Maintenance Programs Needed to Reduce Carbon Monoxide Hazards in Operation of Personal Type Airplanes." A summary of this conference, admitted at trial as plaintiffs' exhibit 79, shows that over 30 representatives of the FAA and the aircraft industry attended, including E.C. Nichols of Piper. This summary, admitted apparently without objection, contains synopses of presentations at the conference. The following two paragraphs are pertinent:
 "As part of the NAFEC [National Aviation Facilities Experimental Center] program, metallurgical studies have been made of materials used in exhaust heat exchangers and exhaust systems. Mr. G.L. Snair of Allegheny Ludlum Steel Corporation, the contractor for these studies, gave a report on this work. He discussed the composition and characteristics of a number of the stainless steels used in exhaust systems, including AISI 320, 321, and 347. Using slides, Mr. Snair illustrated what had been found through analysis of the materials used in several failed parts. Most of the failed parts showed severe oxidation, carburization, and indications that they had passed through the sigma phase which occurs about 1650°F. Engines operating at 1600°F., therefore, are approaching the limits of AISI 321 and 347 stainless steels used in exhaust systems.
 "Mr. T. McCunn, also of Allegheny Ludlum, spoke and recommended that AISI 310 or Incoloy be used in exhaust systems since these metals are good for 1800 to 1900°F. He indicated that AISI 321 costs about $0.60 per pound while Incoloy costs about $1.00 per pound. Excessive *Page 589 
temperature did not contribute to some failures as much as design features which resulted in vibration and thermal stresses. The primary causes for exhaust system failures are overheating and vibration. The work done by Allegheny Ludlum Steel will be published as an official FAA report and become available in the near future."
By virtue of participating in this conference, Piper had notice not only that 321 stainless steel (AISI 321) was a questionable muffler material, but also that the FAA proposed to publish an official report on the studies.
Documents which would be hearsay if offered to prove the truth of the statements therein are not hearsay if they are given in evidence for the purpose merely of proving that the statement was made, provided that purpose be otherwise relevant in the case at trial. Bryant v. Moss, 295 Ala. 339,329 So.2d 538 (1976). Cf. Caterpillar Tractor, supra; Pace v. Louisville Nashville Railroad Company, 166 Ala. 519, 52 So. 52 (1910). Proof that the FAA made statements in the reports that 321 stainless steel was of questionable suitability for aircraft mufflers was relevant to the question of whether Piper was alerted to the possibility that 321 stainless steel might not withstand the stresses in airplane mufflers.
At any rate, the material in exhibits 80-84 is largely cumulative of the matters set out in exhibit 79. While the record is a trifle unclear whether Piper objected to admission of exhibit 79, Piper does not argue on appeal that admission of this exhibit was error. This exhibit being in evidence established some foundation for the proposition that stainless steel 321 was a questionable material, so the following exhibits are cumulative and indicate that Piper should have known that the use of stainless steel 321 was questioned in the industry. Therefore, under the harmless error rule, we are unable to say that admission of exhibits 80-84 was such prejudicial error as to require reversal.
A federal statute, 49 U.S.C. § 1354 (b), provides that:
 ". . . Publications purporting to be published by the [Federal Aviation] Administrator[1] shall be competent evidence of the orders, decisions, rules, regulations, and reports of the Administrator therein contained in all courts of the United States, and of the several States, Territories, and possessions thereof, and the District of Columbia, without further proof or authentication thereof." (Emphasis added.)
Piper makes no response in its reply brief to this citation. Because plaintiffs did not rely on this code section below, the trial court did not rule on it, and the record does not indicate whether these reports are within the import of the section, we choose not to rule on the basis of this section. Plaintiffs offered the reports to show notice to Piper, the judge admitted them on that basis, and we find no reversible error in that ruling.
Nor do we reverse on the basis of the trial judge's admission of exhibits 82, 83, and 84 even though they had not been produced before trial under the terms of the pre-trial order. The trial judge reaffirmed his decision to admit these documents in denying Piper's motion for judgment notwithstanding the verdict or, in the alternative, for new trial:
 "Piper also argues that the Court erred in admitting over its objection the reports identified as plaintiffs' exhibits 82, 83 and 84 because those reports had not been produced in advance of trial in compliance with this Court's pretrial order.
 "Plaintiffs' exhibits 82, 83 and 84 were not produced by plaintiffs' counsel until after the commencement of the trial. They explained that they had no knowledge of these three reports earlier, although they had requested that the Federal Aviation Administration produce all reports in its custody relating to the testing of aircraft engine exhaust systems. *Page 590 
Plaintiffs' counsel only received the reports themselves from the Federal Aviation Administration during the trial and then immediately notified Piper's counsel of the existence of the same.
 "At the time, this Court examined those reports and concluded that they confirmed the conclusions reached in the first two reports, plaintiffs' exhibits 80 and 81 which had been produced by plaintiffs' counsel in compliance with this Court's pretrial order.
 "The failure to produce plaintiffs' exhibits 82, 83 and 84 was not the result of negligence on the part of plaintiffs' counsel. Furthermore, the findings and conclusions in those reports were already known to Piper, since they were essentially the same findings and conclusions as those contained in the reports which had been earlier produced to Piper. The Court, therefore, concluded that Piper was not prejudiced by their admission."
Plaintiffs, through no lack of diligence on their part, only received these reports from the FAA after trial began. Furthermore, these documents are largely repetitive of exhibits 79, 80 and 81. Amendment of a pre-trial order is within the discretion of the trial judge. Stephens v. Central of GeorgiaR.R. Co., 367 So.2d 192 (Ala. 1978). We find no abuse of discretion by the trial judge in admitting these exhibits.
Piper also alleges error in the trial court's ruling on certain testimony regarding the effect of inflation on damages for wrongful death under Georgia law, citing Edwards v.Southern Railway Co., 52 Ga. App. 557, 184 S.E. 370 (1936). We find the cases cited by plaintiffs, including Henry Grady HotelCorp. v. Watts, 119 Ga. App. 251, 167 S.E.2d 205 (1969), andWoods v. Anderson, 145 Ga. App. 492, 243 S.E.2d 748 (1978), to be more closely on point. The trial court's ruling admitting this evidence is due to be upheld.
Finally, Piper appeals from the trial court's refusal to give several of its requested jury instructions. Some of these were adequately covered by the court and others are not required under the applicable Georgia law.
Instruction number 11 would have charged that if the jury was reasonably satisfied "that the defendant designed and manufactured the said aircraft with that degree of care which a reasonably prudent aircraft designer would have employed under the same or similar circumstances at the time involved," the jury should find for the defendant. The trial court charged in almost these exact words regarding Piper's duty, except that it omitted "at the time involved." We do not find this to be error, because the evidence that Piper should have known of the risks of 321 stainless steel pre-dated the design of the Warrior in 1973. Therefore, the time element omitted by the court was not at issue.
Instructions 12, 19, and 20 state that there is no duty to build the safest possible, or an accident proof, airplane. Piper cites three Georgia cases for the principles stated in these instructions. Hunt v. Harley-Davidson Motor Co.,147 Ga. App. 44, 248 S.E.2d 15 (1978); Stovall Company v. Tate,124 Ga. App. 605, 184 S.E.2d 834 (1971); and Wansor v. GeorgeHantscho Company, 595 F.2d 218 (5th Cir. 1979) (applying Georgia law). These cases all concern obvious defects or conditions of which the plaintiffs were aware — lack of crash bars on a motorcycle, the possibility of stones thrown from a lawnmower, and a dangerous printing press — and so are distinguishable from this case. The courts in all three cases noted that they were not dealing with latent defects of which the manufacturer had given no warning. The carburization and oxidation in the airplane mufflers could not be detected even by a mechanic until a crack actually appeared because the corrosion worked from the inside out. The rules in the above-cited cases are therefore not exactly on point. Moreover, we consider if error did occur it would be harmless in view of the entire oral charge to the jury. Rule 45, A.R.A.P.
Instructions 24 and 25 regard defective maintenance as an independent intervening *Page 591 
cause. The trial court properly instructed on proximate cause "without the intervention of any other or independent cause." This adequately covers the requested instructions, and therefore we find no error in the refusal of 24 and 25.
The judgment is therefore affirmed.
AFFIRMED.
TORBERT, C.J., and FAULKNER, EMBRY and ADAMS, JJ., concur.
[1] See Pub.L. 89-670, § 6 (c)(1), Oct. 15, 1966, 80 Stat. 937, regarding the transfer of functions to the Secretary of Transportation, to be exercised by the Administrator.